

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT SEIWERT, and 7809 TIMBER HILL LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>FIRST AMERICAN FINANCIAL CORPORATION, a Delaware corporation, and FIRST AMERICAN TITLE COMPANY, a California corporation,<br><br>Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Scott Seiwert and 7809 Timber Hill LLC ("Plaintiffs"), on their own behalf and on behalf of all others similarly situated ("Class Members"), bring this class action against First American Financial Corporation and First American Title Company (collectively "FATCO" or "Defendants") and complains and alleges the following upon personal knowledge as to [his/her] own experiences, and based upon information and belief as to other matters:

## INTRODUCTION

1.      Owning a home is a quintessential element of the American dream. Many Americans spend years saving for a down payment and searching for the perfect property to

COMPLAINT - 1

**TOUSLEY BRAIN STEPHENS PLLC**<br>1700 Seventh Avenue, Suite 2200<br>Seattle, Washington 98101<br>TEL. 206.682.5600 • FAX 206.682.2992

call home. And for many of those people, the process of buying or selling real property will be one of the most important financial transactions they will enter into in their entire lives.

2.      The actual process of closing a real estate sale is arduous. Purchasers must fill out numerous documents and provide highly personal information, including copies of identification, proof of income, social security numbers, employer identification number, income tax information, and banking information. Property buyers, especially in the context of such a major financial investment, reasonably expect that when they provide this information to companies tasked with facilitating real estate sales, it will be safeguarded and protected from disclosure to unauthorized third-parties.

3.      Knowing that this information is deeply personal and highly valuable on the black market, title insurers collect and store this information on secure data management platforms, which are designed to restrict and control who has access to this sensitive data.

4.      Defendants First American Financial Corporation and its subsidiary First American Title Company—collectively the largest parent/subsidiary title insurance company in the United States—recognized this. It explicitly promised its customers that it would utilize robust data security measures as part of the high cost of its title services.

5.      In reality, and contrary to this promise, FATCO actually allowed *anyone* to access the sensitive personal information of millions of its customers. And many, if not all, of these files were actually—and repeatedly—accessed both before and after FATCO was warned about this breach.

6.      FATCO's non-existent data security made it possible for even the most novice of computer users to discover and access any customer's private information contained in their transaction documents. FATCO customers are sent a URL containing their documents. The

COMPLAINT - 2

URL is accessible without a secure login or confirming the identity of the viewer. The URL might end in a series of numbers with a document identification number, such as "DocumentID=0000085."

7.      These numbers are not assigned randomly, but sequentially. Accordingly, anyone with the URL of one customer's data could simply replace one or more of the digits to access every one of FATCO's 885 million customer documents and the personal information contained therein.

8.      FATCO's inadequate data security was both negligent and a breach of its promises to millions of customers who entrusted it with their data. Any individuals who did business with FATCO now face a serious risk of identity theft and other financial harms.

9.      Plaintiffs' data was compromised by FATCO woefully insufficient data security mechanisms and now seeks compensation for their increased risk of harm, for overpayment for FATCO's services (which did not include the promised level of privacy, security, or confidentiality), and equitable relief such as reforms to FATCO's data security, on behalf of all persons similarly harmed.

## PARTIES

10.     Plaintiff Scott Seiwert is a resident and citizen of Washington State.

11.     Plaintiff 7809 Timber Hill LLC is a Washington limited liability company with its principal place of business in Bellevue, Washington.

12.     Defendant First American Financial Corporation is a Delaware corporation with its principal place of business in Santa Ana, California.

13.     Defendant First American Title Company is a California corporation with its principal place of business in Santa Ana, California. First American Title Company is a

COMPLAINT - 3

subsidiary of First American Financial Corporation.

14.     Defendants First American Financial Corporation and First American Title Company are financial institutions as defined in the Gramm-Leach-Bliley Act, Pub. L. 106-102, 113 Stat. 1338. As such they are subject to its laws governing data privacy.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This lawsuit is a class action with an amount in controversy over $5 million, involving over 100 proposed class members, some of whom are from a different state from a defendant.

16.     This Court may exercise personal jurisdiction over Defendant First American Title Company because it is registered to conduct business in the State of Washington; has designated an agent for service of process in Washington; has at least 28 offices in the State of Washington; has employees located in the State of Washington; and the claims at issue involve transactions entered into, and pursuant to contracts, with citizens of the State of Washington regarding real property located in the State of Washington. The exercise of personal jurisdiction over Defendant First American Title Company in Washington would not offend traditional notions of fair play and substantial justice.

17.     This Court may exercise personal jurisdiction over Defendant First American Financial Corporation because it provides and participates in the document management and storage systems at issue in this litigation. It knows that it provides these services on behalf of the customers of First American Title Company and knows that these customers include residents of Washington State and real property within the State of Washington. It therefore, knew or should have known, that it could be haled into court in Washington for its conduct

COMPLAINT - 4

related to document management and storage. The exercise of personal jurisdiction over Defendant First American Financial Corporation in Washington would not offend traditional notions of fair play and substantial justice.

18.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. FATCO Collects Personally Identifiable Information and Other Sensitive Information from its Customers

19.    FATCO is one of the largest title insurance company in the United States.[1] In 2018 it reported a total revenue of $5.7 billion for its title insurance and related closing services.[2] And it has nearly 25% of total title insurance market share.[3]

20.    Title insurance is an important component of purchasing any property. Indeed, it is a requirement for almost anyone trying to get a mortgage. Title insurance protects property owners' from claims against title to their property after their sale has closed and title has transferred. FATCO encourages customers to utilize its services because "A real estate purchase may be the largest financial investment you ever make. So, when you buy an owner's policy of title insurance, just think of it as buying some peace of mind!"[4]

21.    FATCO's title professionals also provide additional settlement and closing services for its customers. This process "requires more than 100-time consuming steps. These

---

[1] https://www.alta.org/news/news.cfm?20170905-Title-Industry-Generates-37-Billion-in-Premiums-During-Q2
[2] http://investors.firstam.com/investors/news-and-events/news/press-release-details/2019/First-American-Financial-Reports-Results-for-the-Fourth-Quarter-and-Full-Year-of-2018/default.aspx
[3] https://www.alta.org/news/news.cfm?20171214-Title-Industry-Generates-39-Billion-in-Premiums-During-Q3
[4] https://www.firstam.com/ownership/videos/what-is-title-insurance/

COMPLAINT - 5

might include reviewing the contract or closing instructions, depositing loan funds, paying off prior mortgages, coordinating property inspections, preparing HUD-1 settlement statements, among many others. These professionals then coordinate and finalize documents, close the transaction, and submit pertinent documents for proper recordation in public records."[5]

22.    In the process of purchasing a home, FATCO customers will supply FATCO with personally identifiable information ("PII") and other sensitive personal information. Business entities may supply PII of its members or officers and will provide sensitive corporate information, including financial information.

23.    PII is any information about an individual that can, alone or when combined with other information, be used to distinguish or trace an individual's identity. This includes name, social security number, date and place of birth, mother's maiden name, or biometric records, and any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information.[6]

24.    PII and other sensitive information is extremely valuable on the black market. Criminals can use this information to steal money by create fraudulent credit accounts and filing false tax returns. When this information is exposed, victims are at a substantially increased risk of identity fraud and becoming the target of financial crimes.

**B. FATCO Ignores Warnings that It Exposed 885 Million Sensitive Documents**

25.    Customers know that PII and other sensitive information should be kept private and expect that the companies they provide it to will protect it.

---

[5] https://www.firstam.com/title/wa/products/an-overview-of-title-insurance-and-settlement-services.html

[6] https://csrc.nist.gov/glossary/term/personally-identifiable-information

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

26.     FATCO tells prospective customers that it is capable of complying with these expectations.

27.     FATCO's document storage systems were not secure. Ben Shoval, a real estate developer, first discovered that FATCO customer data was exposed and accessible by anyone. Mr. Shoval realized that he had access to other customers' data that he should never have been allowed to view.

28.     Mr. Shoval contacted cybersecurity researcher and journalist, Brian Krebs, with the hope that doing so could stop the exposure.

29.     Mr. Krebs confirmed Mr. Shoval's findings, which indicated that FATCO's website exposed approximately 885 million files, dating back more than 16 years—with the earliest document number being 000000075 and increasing sequentially beyond 885 million. No authentication was required to read these documents.[7]

30.     Brian Krebs reached out to FATCO, but was likewise ignored. On May 24, 2019, Krebs announced on his cybersecurity blog that these 885 million files were available for anyone to access on FATCO's website. By 2 p.m. on the same day, FATCO had disabled the portion of its site where the records were stored. [8]

**C. Consumers Expect Data Privacy as Part of Their Title Insurance Premiums**

31.     Title insurance is extremely expensive—and highly profitable. In 2006, Forbes reported that the average cost of FATCO title insurance was nearly $1,500—despite the fact

---

[7] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

[8] *Id.*

COMPLAINT - 7

that due to digitalization of recorded documents, a title search can cost as little as $25.[9] And due to these same technological advances, claims rates are decreasing. Claims rates on title insurance are low at less than 5%.[10] In 2006, only 74% of each policy's premiums went to pay out claims.[11]

32.    With more than $1000 per policy at FATCO's disposal for overhead, customers reasonably believe that the high cost of title insurance will not only buy peace of mind with respect to title to their property, but also that their documents and the sensitive information contained therein will be securely stored.

**D. FATCO's Exposure of These Documents Breaches its Privacy Promises**

33.    FATCO's privacy policy makes numerous representations and promises about the adequacy of its data security to protect current and former customer information.

34.    The very first statement in FATCO's privacy policy is: "We Are Committed to Safeguarding Customer Information."[12]

35.    FATCO then goes on to promise that it "will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law." It claims, however, that it "may . . . store such information indefinitely, including the period after which any customer relationship has

---

[9] Scott Woolley, Inside America's Richest Insurance Racket, Forbes (Oct. 28, 2006), https://www.forbes.com/forbes/2006/1113/148.

[10] Jeff Andrews, Title insurance is a scam and it's time for a government takeover, Curbed (Feb. 26, 2008) https://www.curbed.com/2018/2/26/17017142/title-insurance-scam-government-takeover

[11] Scott Woolley, Inside America's Richest Insurance Racket, Forbes (Oct. 28, 2006), https://www.forbes.com/forbes/2006/1113/148.

[12] https://www.firstam.com/privacy-policy/index.html

COMPLAINT - 8

ceased."[13]

36.    In the section on "Confidentiality and Security," FATCO states: "We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you." It further promises and represents that it "currently maintain[s] physical, electronic, and procedural safeguard that comply with federal regulations to guard your nonpublic personal information." Later it promises it "will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain." [14]

37.    FATCO further recognized the need to require authentication before allowing people to access specific customer information: "There are times, however, when we may need information from you, such as your name and email address. . . . Usually, the personal information we collect is used only by us to respond to your inquiry, process an order or *allow you to access specific account/profile information*."[15]

38.    All of these representations and promises were decidedly false: FATCO allowed private customer documents to be publicly-accessible on its website.

39.    FATCO breached each of these promises by failing to implement even the most rudimentary security protocols—such as requiring a customer to login to view his or her personal documents—to protect current and former customer data from exposure to the public at large.

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

COMPLAINT - 9

40.      FATCO should have known better. It cautions homeowners to be "cyber smart" and to "be careful what you share and with whom. Information made available online can be accessed and used to gain access to personal and financial information."[16] It also offers its own cybersecurity insurance products to companies covering "cyber security breaches, whether the result of cyber-attacks, cyber-crime, or internal carelessness"—the last of which is exactly what happened here.[17]

**E.  FATCO Ignores Warnings that the Real Estate Industry is a Target for Identity Theft**

41.      FATCO did not just ignore its own warnings and advice. In 2017, the FBI warned that the real estate industry—and title insurance companies in particular—were being targeted by cyberattackers.[18] In 2017, the FBI reported an explosion of cybercrimes related to real estate—finding that nearly $ 1 billion had been "diverted or attempted to be diverted" from real estate transactions, up from $19 million just the year before.[19]

42.      Specifically, title insurance companies were being targeted by Business E-mail Compromise ("BEC") scams. These are not run of the mill PII farming and selling operations, but sophisticated efforts to target businesses that regularly make wire transfer payments. Using transaction specific information—often the title, buyer, or sellers' agent identity—the scammers will send seemingly legitimate looking changes to wire instructions and victims will unwittingly divert hundreds of thousands of dollars to criminals instead of the intended

---

[16] https://www.firstam.com/ownership/cybersmart/

[17] https://firstam.com/title/agency/agency-insurance/

[18] https://www.ic3.gov/media/2017/170504.aspx

[19] https://www.washingtonpost.com/realestate/hackers-prey-on-home-buyers-with-hundreds-of-millions-of-dollars-at-stake/2017/10/30/0379dcb4-bd87-11e7-97d9-bdab5a0ab381_story.html?noredirect=on&utm_term=.ddffa815fd0f

COMPLAINT - 10

recipient.

43.     Most often BEC scams begin with a "phishing" email in which the perpetrator attempts to obtain specific information from the target about individuals and transactions. Here, because FATCO simply made these documents available for the public to see, there would be no need for this additional step. Scammers could simply access the documents and the sensitive information in them to pursue their schemes.

44.     FATCO ignored these warnings. It chose not to investigate its security to determine whether there was any risk of exposure and failed to invest in sufficient data security and privacy protections. Instead, it just left its customers' private documents vulnerable to unrestricted access by anyone.

45.     FATCO's lax security would undoubtedly have been discovered had it hired a cybersecurity expert to conduct a penetration test, or PEN test, to identify security vulnerabilities.[20]

46.     Likewise, an "application security test" to test the security strength of a web application would have identified what information was publicly available on the company's website to anonymous users.[21]

**F.  FATCO has Exposed its Customers to Increased Risk of Identity Theft**

47.     By allowing customer documents to be publicly accessible, FATCO made it easy for cybercriminals to obtain millions of customers' personal information. As cybersecurity researcher Brian Krebs remarked, it "would not have been difficult for even a novice attacker"

---

[20] https://www.doi.gov/ocio/customers/penetration-testing; https://cybersguards.com/web-application-penetration-testing-checklist-updated-2019/

[21] https://www.techopedia.com/definition/29826/web-application-security-testing; https://www.synopsys.com/blogs/software-security/application-security-vs-software-security/

COMPLAINT - 11

to mass-harvest this data.[22]

48.    The information exposed "would be a virtual gold mine for phishers and scammers" looking to obtain information to conduct real estate fraud, such as impersonating "real estate agents, closing agencies, title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters." [23]

49.    The documents leaked by FATCO contain not only personal customer information, but the very information necessary for real-estate fraud scammers.

50.    Companies that frequently enter into real estate transactions are prime targets for BEC scammers who may recycle the information disclosed by FATCO to divert funds in future sales involving the same parties.

**G. Plaintiffs are Victims of FATCO's failure to provide adequate data security**

51.    Plaintiff Scott Seiwert used FATCO's services for several transactions in Washington. In January 2015 he purchased a home in Seattle under the name of a limited liability company. In September 2017, he purchased a home through his family trust in Mazama, WA. In July 2017, he sold property in Seattle, WA that used FATCO.

52.    Plaintiff 7809 Timber Hill LLC used FATCO title services for the purchase of 7809 Timber Hill Dr., Everett, WA 98203 in May 2019.

53.    Plaintiffs believed, at the time of purchasing title insurance, that FATCO would maintain adequate security and ensure the privacy of the personal information provided to it.

54.    Plaintiffs would not have used FATCO as their title insurer or would have

---

[22] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

[23] *Id.*

COMPLAINT - 12

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

objected to the selection of FATCO as title insurer had they known that it would expose their sensitive documents by making them publicly available over the internet.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action on behalf of a Nationwide Class and Washington Subclass, as defined as follows:

a.  <u>Nationwide Class:</u> All persons who utilized FATCO's title insurance or other closing services in a real estate transaction that involved mortgage financing.

b.  <u>Washington Subclass:</u> All persons who utilized FATCO's title insurance or other closing services in connection with a real estate transaction, who (i) were or are residents of the State of Washington prior to May 24, 2019, and/or (ii) obtained such services for real property located in the State of Washington.

56.     To the extent necessary for manageability, Plaintiffs propose, in the alternative to the Nationwide Class, that the Court certify state subclasses in order to group similar causes of action for states requiring similar evidentiary proof, defined as follows:

a.  <u>Alternative Statewide Subclasses:</u> All persons who utilized FATCO's title insurance or other closing services in connection with a real estate transaction, who (i) were or are residents of [name of State] prior to May 24, 2019, and/or (ii) obtained such services for real property located in [name of State].

57.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into further subclasses or modified in any other way. Plaintiffs reserve the right to propose other subclasses prior to trial.

58.     Excluded from the Class and Subclasses are Defendants, and their parents,

COMPLAINT - 13

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

subsidiaries, agents, officers and directors. Also excluded is any judicial officer assigned to this case and members of his or her staff.

59.    Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3). In the alternative, Plaintiffs seek class certification under Fed. R. Civ. P. 23(c)(4) because the common questions listed herein predominate as to particular issues that could substantially advance the litigation. The proposed classes and subclasses meet the applicable requirements for certification under Fed. R. Civ. P. Rule 23.

60.    **Numerosity**: The exact number of members of the Classes is unknown to Plaintiffs at this time, but on information and belief, there are likely over a million class members, making joinder of each individual member impracticable. Ultimately, members of the Classes will be easily identified through Defendants' records.

61.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to:

62.    Whether Defendants failed to safeguard Plaintiffs' and the Classes' sensitive information adequately;

63.    Whether Defendants failed to protect or otherwise keep Plaintiffs' and the Classes' sensitive information secure, as promised;

64.    Whether Defendants failed to maintain adequate privacy and security safeguards;

65.    Whether Defendants data security complied with relevant industry and government standards;

COMPLAINT - 14

66.     Whether Defendants acted negligently in failing to secure and safeguard Plaintiffs' and Class Members' data;

67.     Whether Defendants were negligent in failing to secure Plaintiffs' and Class Members' data as soon as they were informed about the exposure;

68.     Whether Defendants breached their contracts with Class Members;

69.     Whether Defendants engaged in unfair or deceptive practices by failing to safeguard Plaintiffs' and the Classes' Sensitive Information properly, as promised;

70.     Whether Defendant violated the consumer protection statutes applicable to Plaintiffs and the Classes;

71.     Whether Defendants conduct entitles Class Members to damages or restitution, and if so, in what amount; and

72.     Whether injunctive relief is appropriate to ensure the future privacy and security of Class Members' personal information.

73.     **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with them.

74.     **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

COMPLAINT - 15

75.    **Risks of Prosecuting Separate Actions**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendants or would be dispositive of the interests of members of the proposed Classes.

76.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Plaintiffs and proposed Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Classes, and making final injunctive relief appropriate with respect to the proposed Classes as a whole. Defendants' practices challenged herein apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the proposed Classes as a whole, not on individual facts or law applicable only to Plaintiff.

77.    **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Classes. The injuries suffered by each individual member of the Classes are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendants' conduct. Absent a class action, it would be virtually impossible for individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the legal and factual issues presented here. By contrast, a class action presents

COMPLAINT - 16

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Requiring individual Class Members to seek relief on their own would be prohibitively costly to all parties, including Defendants, and overburden the court system.

## FIRST CAUSE OF ACTION
### Violation of the Washington Consumer Protection Act
**(On behalf of Plaintiffs and the Nationwide Class or, in the alternative, the Washington Subclass)**

78.     Plaintiffs reallege and incorporate all previous paragraphs as though fully set forth herein.

79.     Plaintiffs and the Class Members are current and former customers who received title insurance and other closing services from FATCO.

80.     Defendants provide title insurance and other closing services in Washington state. FATCO maintains offices in the state, employs title insurance professionals in the state, and insures real property located in the state. The conduct that Plaintiffs challenge directly affects the people of the State of Washington.

81.     Washington's Consumer Protection Act, RCW §§ 19.86.010, *et seq.* ("WCPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

82.     To achieve that goal, the WCPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." RCW § 19.86.020.

83.     Defendants accepted responsibility for securing the privacy and confidentiality of Plaintiffs' and Class Members' sensitive information and documents. Given that it was Defendants' responsibility for creating, overseeing, maintaining, and otherwise implements its

COMPLAINT - 17

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

own data security practices, Defendants knew (or should have known) that it was not adequately protecting Plaintiffs' or Class Members' personal information in accordance with its express statements, industry standards, and customer expectations.

84.     Defendants' conduct was deceptive. By failing to honestly disclose its true data security practices at the time that it accepted and maintained Plaintiffs' and Class Members sensitive information and documents, Defendants made affirmative misrepresentations and thus engaged in deceptive acts or practices.

85.     Defendants' conduct was unfair. By failing to disclose its compliance with its own data security representations and other obligations, Defendants engaged in unfair acts or practices. Defendants made data security representations to assuage and attract potential customers, including Plaintiffs and Class Members who were concerned about the privacy and security of their sensitive information and documents.

86.     Given that only Defendants knew about the true state of the data and document security and privacy practices and that Defendants also knew that no reasonable consumer would purchase title insurance and closing services that would ultimately expose their private information to the public, Defendants purposefully used its inflated representations of data security and privacy protocols, which they knew were false at the time they were made to consumers, to mislead Plaintiffs and Class Members into using and/or paying for its insecure services. Defendants' conduct therefore had the capacity to deceive a substantial portion of the public.

87.     Defendants failed to make good on their promises and representations about adequate data security by not investing in or implementing necessary protocols and resources into its cybersecurity program. This includes implement simple application based protections,

COMPLAINT - 18

such as requiring logins to access sensitive documents. In light of the known risks of maintaining sensitive information and documents on its servers and making them available on their webpage, Defendants conduct was likely to cause substantial injuries to consumers.

88.    Because Defendants alone controlled the implementation of their data security measures and the policies for uploading customer documents to their webpage, the public, including Plaintiffs and Class Members, could not have avoided the injury caused by Defendants conduct.

89.    Had Plaintiffs and the Class Members known that Defendants had not actually implemented adequate security measures and protocols, they would not have been willing to provide Defendants with their sensitive information and documents.

90.    Defendants' deceptive and unfair acts or practices occurred in its trade or business and has proximately caused injury to Plaintiffs and Class Members. Defendants' general course of conduct is injuries to the public interest, and such acts are ongoing and/or have a substantial likelihood of being repeated inasmuch as the long-lasting harmful effects of its misconduct may last for years.

91.    Defendants' deceptive and unfair acts or practices also impact the public interest. The security and privacy of exchanged information is fundamental to the stability of real estate transactions. Washington and its residents have an interest in ensuring that when property is purchased and sold within the state that the parties to the transaction will be adequately protected from public exposure of their personal information.

92.    As a result of Defendants' conduct, Plaintiffs and Class Members have suffered actual damages, including the lost value of their privacy, the lost value of their personal data and lost property in the form of their breached and compromised sensitive information;

COMPLAINT - 19

ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

93.     Further, as a result of Defendants' conduct, Plaintiffs and Class Members have suffered actual damages in an amount equal to the difference in the title insurance and closing services they purchased and the unsecured title insurance and closing services they received.

94.     Accordingly, Plaintiffs, on behalf of themselves and Class Members, seek to enjoin further violation and recover actual damages and treble damages (where applicable), together with the costs of bringing this suit, including reasonable attorneys' fees.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Contract**
**(On behalf of Plaintiffs and the Nationwide Class, or, in the alternative, the Washington Subclass and Statewide Subclasses)**

95.     Plaintiffs reallege and incorporates all previous paragraphs as though fully set forth herein.

96.     Plaintiffs and the Class Members relied on FATCO's representations regarding privacy and data security before purchasing services from FATCO.

97.     Plaintiffs and the Class Members entered into contracts for title insurance and other closing services with FATCO.

98.     The terms of FATCO's privacy policy are part of those contracts.

COMPLAINT - 20

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

99.     Plaintiffs and Class Members performed substantially all that was required of them under the contract with FATCO, or they were excused from doing so.

100.    FATCO failed to perform its obligation under the contract, including by failing to provide adequate privacy, security, and confidentiality safeguards for Plaintiffs' and Class Members' information and documents.

101.    As a direct and proximate result of FATCO's breach of contract, Plaintiffs and Class Members did not receive the full benefit of the bargain under their contracts, and instead received title insurance and other closing services that were less valuable than described in their contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in value between that which was promised and Defendants' deficient performance.

102.    As a direct and proximate result of FATCO's breach of contract, Plaintiffs and Class Members have suffered actual damages arising from the exposure of their personal information and they remain at imminent risk of suffering additional damages in the future.

103.    Plaintiffs and Class Members have been injured by Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**Quasi-Contract/Restitution/Unjust Enrichment**
**(On behalf of Plaintiffs and the Nationwide Subclass or, in the alternative, the Washington Subclass and Statewide Subclasses**

104.    Plaintiffs reallege and incorporate all previous paragraphs as though fully set forth herein.

105.    Plaintiffs and Class Members alleged additionally and alternatively, that they conferred a monetary benefit on Defendants in the form of fees and insurance premium payments for title insurance and other closing services. Defendants appreciated or had

COMPLAINT - 21

knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

106.    The fees for title insurance and other closing services that Plaintiffs and Class Members paid to Defendants were supposed to be used by Defendants, in part, to pay for the administrative costs of data and document management and security.

107.    Defendants did not use such fees to pay for the administrative costs of data and document management and security and to provide to provide adequate privacy, security and confidentiality safeguards for customer's personal information and documents.

108.    As a result, Plaintiffs and Class Members suffered actual damages.

109.    Under principles of equity, it would be unjust to permit Defendants to retain the portion of Plaintiffs' and Class Members' payments that should have been earmarked to provide adequate privacy, security and confidentiality safeguards for Plaintiffs and Class Members' personal information and documents.

110.    Plaintiffs and Class Members seek disgorgement of Defendants' ill-gotten gains.

## FOURTH CAUSE OF ACTION
### Negligence
**(On behalf of Plaintiffs and the Nationwide Class or, in the alternative, the Washington Subclass and Statewide Subclasses)**

111.    Plaintiffs reallege and incorporate all previous paragraphs as though fully set forth herein.

112.    Plaintiffs alleges that Defendants required Plaintiffs and the Class Members to provide sensitive, non-public, personal and financial information in order to obtain their services.

113.    By collecting and indefinitely storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard this information and ensure its privacy and confidentiality, to prevent disclosure of this information to unauthorized persons, to guard the

COMPLAINT - 22

information from theft, and to comply with the terms of its own privacy policy, industry

standards, statutory requirements, and other requirements.

114.    Defendants assumed a duty of care to use reasonable means to implement

policies and procedures to prevent unauthorized exposure of this personal information.

115.    Defendants breached this duty of care by failing to adequately safeguard the

privacy, confidentiality, and security of Plaintiffs' and Class Members' personal information

and documents.

116.    Defendants knew or should have known that customers' documents were

publicly available on their webpage.

117.    Given the publicly available knowledge that the real estate industry, and title

insurance companies in particular, were a target for cybercriminals, phishers and scammers,

Plaintiffs and Class Members are part of a well-defined, foreseeable, finite and discernible

group that was at high risk of having their personal information misused if made available by

Defendants.

118.    Defendants breached their common law, statutory and other duties—and thus,

were negligent—by failing to use reasonable measures to protect consumers' personal

information and documents from exposure to unauthorized third parties, failing to limit the

severity of the exposure, failing to detect the exposure in a timely fashion, and failing to

address the exposure in a timely fashion.

118.    It was therefore reasonably foreseeable that the failure to adequately safeguard

Plaintiffs' and Class Members sensitive information and documents would result in one or

more of the following injuries to Plaintiffs and the Classes: ongoing, imminent, certainly

impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and

COMPLAINT - 23

economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the sensitive information, and other economic and non-economic harm.

119.    Plaintiffs and Class Members have been injured by Defendants' negligence in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**Negligence Per Se**
**(On behalf of Plaintiffs and the Nationwide Class or, in the alternative, the Washington Subclass and Statewide Subclasses)**

120.    Plaintiffs reallege and incorporate all previous paragraphs as though fully set forth herein.

121.    Defendants had a duty of care under Section 5 of the Federal Trade Commission Act and the Gramm-Leach-Bliley Acts.

122.    These laws were designed to protect consumers from the type of injuries alleged in this Complaint.

123.    Defendants breached their duty of care by violating Section 5 of the Federal Trade Commission Act and the Gramm-Leach-Bliley Act.

124.    As a direct and proximate result of Defendants' breach of the duty of care, Plaintiffs and the Class Members suffered injury, as alleged above, in an amount to be proven at trial.

COMPLAINT - 24

## SIXTH CAUSE OF ACTION
**Violation of State Consumer Protection Laws**
*(In the alternative to Count I)*
**(On behalf of Plaintiffs and the Statewide Subclasses)**

125.    Plaintiffs reallege and incorporate all previous paragraphs as though fully set forth herein.

126.    Plaintiffs allege, additionally and alternative, that the consumer protection laws listed below were enacted to protect consumers by promoting fair competition in commercial markets for goods and services. Specifically, they prohibit unlawful, unfair, deceptive, or fraudulent business acts or practices.

127.    As described here, Defendant has engaged in unlawful, unfair, and deceptive business acts or practices.

128.    Based on its statutory and common law obligations, and pursuant to its own representations, Defendants had a duty to safeguard the privacy, confidentiality and security of Plaintiffs and Class Members' personal information and documents that it received from Plaintiffs and Class Members as part of its activities in providing title insurance and other closing services.

129.    Consistent with its representations, Defendants assumed responsibility for securing the privacy, confidentiality, and security of Plaintiffs and Class Members' personal information and documents. Given that it was Defendants' responsibility for creating, overseeing, maintaining, and otherwise implementing its own document and data security practices, Defendants knew or should have known that it was not adequately protecting Plaintiffs and Class Members' information. Defendants failed to make good on their promises of data security.

130.    Defendants' unfair acts or practices occurred in its trade or business and have

COMPLAINT - 25

injured a substantial portion of the public. Defendants' general course of conduct is injurious to the public interest, and such acts are ongoing and/or have a substantial likelihood of being repeated inasmuch as the long-lasting harmful effects of its misconduct may last for years. As a direct and proximate result of Defendants' unfair acts, Plaintiffs and Class Members of the Statewide Subclasses have suffered and will suffer actual injuries.

131.    Defendant's failure to provide timely notice of the data breach violated the following State-specific consumer protection laws:

a)    Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*;

b)    California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*;

c)    California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

d)    Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq.*;

e)    Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b, *et seq.*;

f)    Delaware Deceptive Trade Practices Act, Del. Code Tit. 6, §§ 2531, *et seq.*;

g)    Hawaii Consumer Protection Act, Haw. Rev. Stat. §§ 480-1, *et seq.*;

h)    Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. §§ 481A-1, *et seq.*;

i)    Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*;

j)    Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Ann. §§ 510/1, *et seq.*;

k)    Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

l)    Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, § 205A, *et seq.*;

m)    Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. tit. 10, § 1212, *et seq.*

n)    Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 1, *et seq.*;

o)    Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*;

p)    Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 , *et seq.*;

q)    Minnesota Consumer Fraud Act, Minn. Stat. § 325F.67, *et seq.* ;

r)    Nebraska Consumer Protection Act, Neb. Rev. Stat. Ann. § 59-1601, *et seq.*;

s)    Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. Ann. § 87-301, *et seq.*;

t)    New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*;

u)    New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

v)    Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0903, *et seq.*;

w)    New York Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*;

COMPLAINT - 27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

x)    North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1, *et seq.*;

y)    North Dakota Unlawful Sales or Advertising Practices Law, N.D. Cent. Code § 51-15-01, *et seq*;

z)    Oklahoma Consumer Protection Act, Okla. Stat. Ann. § 751, *et seq.*;

aa)   Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, § 51, *et seq.*;

bb)   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq*;

cc)   Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

dd)   South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*;

ee)   Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*;

ff)    Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. Tit. 9, § 2453(A);

gg)   Washington Consumer Protection Act, Wash. Rev. Code RCW §§ 19.86.010, *et seq.*;

hh)   West Virginia Consumer Credit and Protection Act, W. Va. Code Ann. § 46A-6-101, *et seq.*; and

ii)    Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, *et seq.*

132.   As a result of Defendant's conduct, Plaintiffs and members of the Statewide

COMPLAINT - 28

Subclasses have suffered actual damages, including from the lost value of their personal data and lost property in the form of their breached and compromised Sensitive Information (which is of great value to third parties); ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

133.    Accordingly, Plaintiffs, on behalf of themselves and members of the Statewide Subclasses, seek all remedies available under their state data breach statute, including but not limited to (a) damages suffered by Plaintiffs and the Statewide Subclass members as alleged above, (b) equitable relief, including injunctive relief, (c) punitive, doubled, or trebled damages as permitted by statute; and (d) reasonable attorney fees and costs, as provided by law.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class Members, respectfully requests that this Court enter an Order:

1.    Certifying this case as a class action on behalf of Plaintiffs and the Classes as defined above, appointing Plaintiffs as representatives of the appropriate Classes, and appointing the undersigned attorneys as Lead Class Counsel;

2.    Declaring that Defendants' actions, as described above, constitute violations of the Washington Consumer Protection Act, breach of contract, unjust enrichment, negligence,

COMPLAINT - 29

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

negligence per se, and the consumer protection statutes of the various states.

3. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Classes, including an order (i) prohibiting Defendants from engaging in the wrongful and unlawful acts described here, and (ii) requiring Defendants to safeguard the privacy, confidentiality and security of data and documents collected in the course of its business in accordance with federal, state, and local laws and regulations, and industry standards; (iii) requiring Defendants to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing to determine any further vulnerabilities to Class Members' personal information and documents; and (iv) ordering Defendants to implement new data storage and management protocols that adequately protect the privacy, confidentiality and security of Plaintiffs and Class Members' personal information and documents.

4. Awarding actual, statutory, exemplary and punitive damages to Plaintiffs and the Class, where applicable, in an amount to be determined at trial;

5. Awarding restitution to Plaintiffs and the Classes in an amount to be determined at trial;

6. Awarding Plaintiffs and the Classes their reasonable litigation expenses and attorneys' fees;

7. Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

8. Permitting Plaintiffs and the Classes to amend their pleadings to conform to the evidence produced at trial; and

9. Awarding such other and further relief as equity and justice may require.

COMPLAINT - 30

1  **JURY DEMAND**

2  Plaintiffs request a trial by jury.

3  DATED this 25th day of June, 2019.

4                                    TOUSLEY BRAIN STEPHENS PLLC

5

6  By: s/ *Kim D. Stephens*
       Kim D. Stephens, WSBA #11984
       Email:  kstephens@tousley.com

7  By: s/ *Jason T. Dennett*
       Jason T. Dennett, WSBA #30686
8      Email: jdennett@tousley.com

9  By: s/ *Rebecca L. Solomon*
       Rebecca L. Solomon, WSBA #51520
10     Email: rsolomon@tousley.com

11     1700 Seventh Avenue, Suite 2200
       Seattle, WA 98101
12     Telephone: (206) 682-5600
       Facsimile: (206) 682-2992

13     *Counsel for Plaintiffs and all similarly situated
       persons and entities*

14

15  0099/002/537670.2

16

17

18

19

20

21

22

COMPLAINT - 31